Signed and Filed: February 9, 2015



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Richard and Lisa Wellman,<br>　　　　　　Debtors<br>xxxxx9877<br>xxxxx8429 | Case No. 13-31444 - DM<br>Chapter 11 |
| | Adv. Proc. No. 13-03237 |
| Carol Bennett; Metis<br>Development L.L.C.,<br>　　　　　Plaintiff, Nominal<br>Plaintiff<br>v.<br>Richard and Lisa Wellman,<br>Individuals,<br>　　　　　Defendants. | |
| Richard and Lisa Wellman,<br>Individuals,<br>　　　　　Counterclaimants<br>v.<br>Carol Bennett, an individual;<br>and Metis Development L.L.C., A<br>California limited liability<br>corporation<br>　　　　　Counterdefendant and<br>nominal counterdefendant | |

MEMORANDUM DECISION AFTER TRIAL

-1-

# I.  INTRODUCTION

Trial in this adversary proceeding was held on October 6-8, 14 and December 1-3, 2014.  Plaintiffs Carol Bennett ("Bennett") and Metis Development, LLC ("Metis") appeared and were represented by Thomas Carlson, Esq. of Rogers Joseph O'Donnell, P.C.  Debtors, defendants and counterclaimants Richard Wellman ("Richard") and Lisa Wellman ("Lisa" and with Richard, the "Wellmans") appeared and were represented by Brian Irion, Esq. of Law Offices of Brian Irion.

Having considered the evidence presented, the proposed findings of fact and conclusions of law submitted by the parties, and closing arguments on January 9, 2015, the court, for the reasons that follow, determines that this case is not about intentional wrongdoing or intent to harm anyone.  Rather, it is a case of two long-time friends getting quickly in over their heads in an ill-conceived venture.  At worse, it was a matter of Bennett trusting her friend Richard, who lacked business sophistication, with her significant amount of money to get going on a plan to make them both a lot of money, and Richard, in turn, running a sloppy operation that lacked fiscal discipline.

The use of a form LLC agreement when neither knew anything about business structures or minimal risk-prevention or internal controls does not mean that the two principals in fact acted in a fiduciary relationship toward one another.  The court doubts they even knew what a fiduciary was, so to impose an after-the-fact fiduciary liability on Richard is particularly unjustified.  The Operating Agreement they both signed was honored more in the breach than in fact.

-2-

From the myriad facts and the testimony and documents establishing them, the overall conclusion the court reaches is that whatever liability Richard or Lisa might have to Metis is fully dischargeable in their Chapter 11 bankruptcy case; that the amount of such liability must be determined, or if Metis owes them money that must be determined, so they can hope to propose a plan; and that neither of them owes Bennett anything.

For the reasons that follow, the court determines that the Wellmans owe nothing and Metis owes them $52,783.

II.   DISCUSSSION[1]

**Procedural Background**

Richard and his wife, Lisa, commenced this bankruptcy case by filing a petition under Chapter 13 on June 21, 2013.  Main Case Dkt. No. 1.  The case was converted to Chapter 11 on October 2, 2013.  They continue as debtors in possession as no trustee has been appointed and no plan has been confirmed.

On October 30, 2013, Bennett and Metis filed this adversary proceeding, alleging claims under § 523(a)(2) (fraud), 523(a)(4) (fiduciary defalcation, embezzlement and larceny) and § 523(a)(6) (willful and malicious injury).[2]

The Wellmans answered on December 2, 2013, and asserted a counterclaim against Bennett and Metis for an accounting and

---

[1]   The following discussion constitutes the court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052(a).

[2]   Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

-3-

damages if an accounting determined that the estate was owed money from Metis.[3]

**Dischargeabilty of any Debt of the Wellmans.[4]**

To prevail on a claim under § 523(a)(2)(A), a plaintiff must prove (1) the debtor made the representation, (2) at the time, the debtor knew it to be false, (3) the debtor made the representation with the intent and purpose of deceiving the plaintiff, (4) the plaintiff justifiably relied on the representation, and (5) the plaintiff sustained a loss as a proximate result. "Fraud" means only actual, positive fraud and not fraud implied by law. In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010).

The court rejects plaintiffs' claims of fraud under §523(a)(2) for failure to show any active misrepresentation of a material fact or active concealment of such a material fact, and any intent by Richard or Lisa to deceive Bennett or Metis. There was also no proof that either justifiably relied on any of the foregoing. While it is abundantly clear that Bennett lost a lot of money on the Metis fiasco, that loss cannot be linked to any fraudulent inducement on the Wellmans' part. Nothing more needs to be said about §523(a)(2).

---

[3] This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b). This matter is a core proceeding under 28 USC §157(b)(2) and venue is proper pursuant to 28 USC §1409(a).

[4] As noted above, the court has decided that neither Bennett nor Metis have claims against Richard or Lisa. Nevertheless, the court will deal with the assertions of nondischargeabiity in the event that determination is incorrect and reversed if there is an appeal.

-4-

Under California law, managers of a limited liability company are fiduciaries for purposes of §523(a)(4). Bell v. Flores (In re Flores), 2013 Bankr. LEXIS 4834 (Bankr. N.D. Cal. 2014).

The evidence is overwhelming that neither Bennett nor Richard actually conducted their activities as members of a limited liability company. They went about their business together using Metis as a dba of their joint venture.

For the sake of argument, however, the court will accept Bennett's position that Richard, as the operating member of Metis, was a fiduciary vis-a-vis Metis for sure and her as the equal member. Still, while there once may have been strict liability for a fiduciary who cannot fully account for the assets held in trust for § 523(a)(4) purposes, that rule changed dramatically just two years ago and controls the outcome here.

Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013) clarified that only immoral, culpable or intentional wrongful conduct falls within the scope of § 523(a)(4):

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id.*, § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include 1760\*1760 "wilful blindness").  That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added).  Cf.*Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194,*

Case: 13-03237   Doc# 34   Filed: 02/09/15   Entered: 02/09/15 16:41:18   Page 5 of 33

n. 12, 96 **S.Ct**. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

<u>Id</u>. at 1759-1760

The other two grounds of non-dischargeable conduct under § 523(a)(4), larceny and embezzlement, also require felonious intent. <u>Bullock</u>, supra, 133 S. Ct. 1754, 1761. <u>Urban v. BSC West, LLC (In re Urban)</u>, 2014 Bankr. LEXIS 1669 (9th Cir. B.A.P 2014). Where someone is merely "in over their head" and attempting to do something beyond their skill level, the heightened requirement of <u>Bullock</u> is not met. <u>In re Urban</u>, supra. That is the case here. The court rejects plaintiffs' § 523(a)(4) claims.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." This exception is confined to debts based on intentional torts. <u>Kawaauhau v. Geiger (In re Geiger)</u>, 523 U.S. 57, 60 (1998). In order to prove that a debt is non-dischargeable under to § 523(a)(6), plaintiff must prove that an injury resulted from an act that was both willful and malicious. <u>Ormsby v. First Am. Title Co. (In re Ormsby)</u>, 591 F.3d 1199, 1206 (9th Cir. 2010).

Neither Richard nor Lisa ever intended to harm Metis or Bennett. Of course they intended their acts throughout, but <u>Geiger</u> makes clear that that is not the test. They must have intended to harm the plaintiffs or such harm had to have been substantially certain.

The $5,000 Bennett lent to Richard was repaid. Richard and Bennett talked "all the time" about Metis business. Wellman acted with intent to make Metis successful, and his carelessness and

-6-

lack of business acumen fall far short of the intentional tort
needed to except a debt under this subsection.  The Wellmans lent
the venture money when it was needed.  These were not acts of
people intending to do harm.  They were trying to save the
business.

While Richard perhaps was overly exuberant in expensing
personal items, it was not an uncommon practice for small business
owners, and it was done under the belief that he was entitled to
the items as a form of income, either as guaranteed payments in
money or in kind.  Most importantly, he did not act with intent to
harm Bennett or Metis.

There was no felonious intent by the Wellmans.  Richard set
out with Bennett to do something he had never done before and the
results were predictable.  If the LLC Operating Agreement were to
control, Richard's conduct is not much different from the debtor's
in Bullock.  The court rejects plaintiffs' § 523(a)(4) claims.

What remains is to determine what liabilities, if any, the
Wellmans must deal with in their Chapter 11 case and to whom they
owe it.  Or, whether Metis owes them and whether their claim
against it has any value.  The court will work through the
detailed evidence to answer the first of those two questions.  The
first is easy: were the Wellmans to owe money, if at all, they
would owe it to Metis, not Bennett.  The second, whether a claim
against Metis is worth anything, is for another day.

Under former California law, limited liability companies such
as Metis have the capacity to sue and be sued in their own name.
Cal. Corp. Code § 17355 (repealed 2014).  Cal. Corp. Code §§
17701.05(b) 17704.

-7-

Bennett has asserted a right to pursue claims of Metis in her own name, but provides no authority for the proposition that she may discard the existence of the LLC.  The court will permit her to prosecute the claim of Metis.  She has none of her own.  For the same reason, the court will permit Bennett to defend the claim against Metis.

**Determination of Offsetting Claims and Calculation of Net Amount Owing.**

**Formation of Metis**

Bennett and Richard are lifelong friends, beginning when they were in high school together.  Since the Wellmans have been together, Bennett has been very close to both of them and their children.

In 2003, Richard worked for Cisco, a computer networking company.  His salary varied but he was making several hundred thousand dollars per year.  Lisa worked for a carpet distribution company. Bennett worked as the Vice President of Operations for Bay Advanced Technologies, LLC ("Bay") a company which had acquired the Bennett family business, Bay Pneumatic, some years earlier.  Bennett also was a partner in a family partnership that owned and leased property in Menlo Park to Bay.

Richard and Bennett decided to go into business redeveloping single family houses.  Neither had professional experience in home development or redevelopment and they naively thought that they could make good money "flipping houses;" viz. buying them, improving them, selling them quickly at a good profit.

Rather than seek legal advice regarding how they would do business and conduct their affairs, one of them consulted the

-8-

internet and downloaded a form of operating agreement for creation of a limited liability company (Exhibit 1). They decided to name that company Metis Development LLC and signed the Operating Agreement on September 25, 2003.

During the years that followed until the unfortunate falling out in their relationship, Bennett and Richard honored the LLC Agreement more in the breach than in compliance with it. In fact, they simply acted as they had originally discussed.

Bennett and Richard each owned fifty percent (50%) of Metis, and the overall concept was that Bennett was going to provide the capital while Richard was going to earn his ownership through his labor (i.e., "sweat equity"). They were going to split the profits. Bennett was to do the bookkeeping. There was no understanding as to what expenses would be proper or allowable, how profits would be determined, when profits would be distributed, what it meant to "fund" the operations or provide the capital, how Metis would be operated, what formalities would be observed, or that their relationship would in fact be governed by the form agreement they had signed.

The Operating Agreement specifies that no compensation shall be paid the members for management [Exhibit 1, ¶ 11(6)]. It does provide, however, that:

> Members may be paid, however, <u>for any services rendered in any other capacity</u> for the LLC, whether as officers, employees, independent contractors otherwise. (Emphasis added.)

Just as Richard as the managing member had authority to pay operating expenses of Metis, including any salary or wages to anyone employed by Metis, so too did that same authority permit

-9-

him to pay himself for "services rendered in any other capacity" than as a member. Thus, while Bennett claims not to have agreed to Richard's compensation up to $60,000 per year, she cannot deny that Richard performed services for Metis all the time he was actively working for it.

The only provision of the Operating Agreement dealing with attorneys' fees is limited to arbitration following good faith mediation of disputes:

> If good-faith mediation of a dispute proves impossible or if an agreed-upon mediation outcome cannot be obtained by the members who are parties to the dispute, the dispute may be submitted to arbitration in accordance with the rules of the American Arbitration Association,. Any party may commence arbitration of the dispute by sending a written request for arbitration to all other parties to the dispute. The request shall state the nature of the dispute to be resolved by arbitration, and if all parties to the dispute agree to arbitration, arbitration shall be commenced as soon as practival after such parties receive a copy of the written request.
>
> All parties shall initially share the cost of arbitration, but the prevailing party or parties may be awarded attorney fees, costs and other expenses of arbitration.

Since there was never any arbitration of the present dispute, neither side is entitled to recover attorneys fees.

Richard had no experience in taxes, or running household or business expenses and was not to do the bookkeeping. His job was to run the day-to-day projects Metis planned to undertake and Bennett was in charge of the financial aspect of Metis, in part because she had more competence and in part because it was her money that was to be used to fund Metis' operations. Wellman was not required to contribute to funding the operations of Metis.

Lisa regularly provided help on Metis projects and did side jobs unrelated to Metis using the Metis banking accounts and a

-10-

business name "Simply Staged", later replaced by "Metis Design Group". She was never a member of Metis.

It is clear that neither party relied on the Operating Agreement at all throughout the active existence of Metis. Capital contributions were not recorded; Bennett was not required to participate in the active management of Metis because of her job, and she did not actively participate or devote full time efforts to Metis. The duties she undertook to finance the operations and do the bookkeeping were sporadically fulfilled if at all. The parties' understandings also changed in late 2003 when Richard approached Bennett and they orally agreed to his compensation or advances.

**Initial Expenses and Bookkeeping of Metis**

Richard and Bennett opened bank accounts in August of 2003 before Metis was formed, and began to look for homes to purchase. Richard went to a seminar using Metis funds to learn how to flip residential real estate.

Bennett set up Metis's bookkeeping system using QuickBooks. Richard did not know how to use QuickBooks and throughout Metis' existence, did not use it except on one occasion under the direction and guidance of Alan Bernstein ("Bernstein") the company bookkeeper after Bennett had done the bookkeeping for the first few months.

Bennett, Bernstein and Richard all agreed that no Metis records were kept from her, she was never denied access to Metis's office, she had access to Metis' online banking records. No documents were hidden from her, and according to both Bennett and

-11-

Richard, they talked "all the time" about Metis.   Banking

statements were kept in a filing cabinet at Metis's office.

After Bernstein was hired, Bennett's involvement involved in

the Metis bookkeeping declined.   Richard, not Bennett, gave

Bernstein instructions on how to code the expenses (e.g., Exhibit

142), and how (and to whom) to make payments (e.g., Exhibit 142).

Bennett and Bernstein worked together for several months

reclassifying entries Bennett had made in QuickBooks, entering

data, and updating the books for 2004 and 2005.   In the course of

doing this, Bennett asked for and received from Richard updated

passwords for the Metis's online bank records.   Id.

Bennett regularly came into the Metis office and would

regularly have the company laptop at her home when Bernstein came

to Metis to do bookkeeping.   Bernstein would often come into

Metis's office to find the company laptop with the QuickBooks

company records gone.   Bernstein went to Bennett's house at her

request and go over the Metis QuickBooks files with her.   Bennett

questioned him about matters and seemed to be familiar with

QuickBooks operations and features.

Metis had no policy or procedures for expense review or

disallowance.   In fall of 2003 and spring of 2004, the parties

expensed a number of items including meals, gas charges, Verizon

cell phone bills, Yahoo and GoDaddy internet services, purchases

from Home Depot, Office Depot, Pacific Athletic Club, Costco, and

other items.

The charges and activities incurred through April of 2004

were known to Bennett and she agreed that she approved of these

transactions.

-12-

**Metis Projects**

Metis was generally active from the time of its inception through 2010. By the time of trial the only properties left were two four-plexes on O Street and 26th Street in Sacramento and undeveloped property in Idaho.

Metis bought and sold single family houses in San Mateo County on Orange Street, Elm Street, Alma Street and in San Carlos on Del Rey Court. In most cases the parties were the borrowers because Metis could not borrow on its own to purchase these properties.

Generally Bennett was the primary borrower, but for the house on Alma Street, the Wellmans were borrowers. In at least one instance the Wellmans took title in their own name. Bennett made much of this fact at trial, but the court sees no significance in it. The Wellmans treated the property as owned by Metis.

On some of these projects, Metis would "joint venture" with one or more contractors who sometimes would be listed as a borrower on purchase money mortgages. These joint ventures were not memorialized by joint venture agreements or separate entities. Rather, on the sale of a property, proceeds after expenses would be split between Metis and the other investors. These venture partners included Robert Cook of RNC Construction, Tom Olson, and Mark Kafoury, an electrician who discounted his invoices in return for a portion of profits.

**Richard's Compensation at Metis**

In November of 2003, when Richard's family medical leave from his former employer was coming to an end, he approached Bennett because he could not make ends meet for his family without an

-13-

income and he either would need a regular income or would have to return to his former job. He asked Bennett if he could receive a few short-term loans to tide him over until he could get his overall finances together. They agreed to a $5,000 advance from Metis. These were against Richard's share of Metis's future profits. A second advance in the same amount was made about a month later. There is no evidence of any discussion as to what either party considered non-business-related (personal) expenses.

Bennett reconciled the first two $5,000 checks to Richard in November and December of 2003. While the checks were not listed as "salary", neither were they listed or marked as "loans." Rather, Bennett entered them either as "expendable expenses" or "prof. consulting". Bennett noted that Richard had changed the "memo" from "bonus" to "expenses" but Bennett saw the checks and stubs with these changes, and entered them in the QuickBooks company file as expenses. Id.

Richard did not take a regular payment of $5,000 because he did not want to take the money unless he had to. Metis was a "start-up" and also because he knew it was Bennett's money funding Metis.

When Bernstein started at Metis he assumed the payments to Richard were in the form of a salary, and did not speak to either Richard or Bennett about them. In the eighteen month period between November, 2003 and March 31, 2005, there were only seven, five in the amount of $5,000.

Wellman would periodically ask Bernstein whether he had taken more or less than $60,000 per year in expenses and income. When Bernstein reported that Wellman had exceeded the amount, Wellman

-14-

would put money into Metis's accounts or would pay a Metis bill himself.  The only time he went over this amount was 2008, when he had to deal with a tax liability of $21,000, and for that, he attributed the tax payment as personal income.

Richard made a series of payments to himself, either by writing Metis checks to himself, to Lisa Wellman, by making electronic transfers or taking cash, by writing checks to third parties for the Wellmans' personal obligations (e.g., the Internal Revenue Service and Franchise Tax Board, and by having Metis pay his personal expenses.  Some checks and withdrawal slips were annotated with the word "loan" on them, in Wellman's handwriting.  No personal expense payments by Metis for Richard are listed on the "loans to shareholders" records for the years 2003 through 2008.  A few personal expense payments, mostly to credit card companies, are listed foe the years 2009 and 2010.

Richard claimed that the personal expenses he was having Metis pay on his behalf as part of his claimed "salary" were annotated in the books and records of Metis with a "P."  The few expenses marked with a "P" are shown on the spreadsheets which are parts of plaintiffs' Exhibit 117, and on spreadsheets F-1 and F-2 of the Wellmans' expert report.

Bennett and Richard also visited Metis' accountant, who had provided some advice regarding whether payments to Richard should be treated as loans.  Bennett wrote that it did not make sense that Metis would be "loaning" money to Richard.  He replied that he had taken a total of $20,000 as a "payment."  After receiving this advice, however, Richard began to note on checks that his advances were "loans."  The cash payments for Richard were

-15-

characterized as "loans" on Metis' income tax returns (Exhibit 99, 100, 10; defendants' expert report, Exhibit E-1). These returns were prepared by Metis' original tax accountant, Mario Salzano.

Metis replaced Mr. Salzano with Mark Setzen as its tax accountant in approximately the summer of 2008. At that time Metis' 2006, 2007 and 2008 tax returns had not been filed. He subsequently filed returns from those years and for 2009.

The cash payments to Richard were characterized on the K-1s to Richard Wellman for 2006-2009 as "guaranteed payments," a term coined by Mr. Setzen (Exhibits 103, 105, 107, 109). This was consistent with the understanding of both Bennett and Richard, viz., that Wellman was not borrowing money from Metis. Either he was being compensated for his efforts or being given guaranteed advances against his share of future profits.[5]

During the years 2003, 2004, 2005 and the original return for 2006 the Wellmans did not report any of Richard's income from Metis on their personal tax returns (Exhibit 110 for year 2005). Lisa testified that she was the one responsible for the personal income tax returns. The income was not reported even though both Richard and Lisa testified that Richrd was to receive a salary of $60,000 a year. An amended tax return was filed for 2006 which included the cash amounts received from 2003-2006 (Exhibit 111).

The only personal expense payments by Metis for Wellman that were reported by the Wellmans on their personal income tax returns for 2009 were those reported on the "Register: Loans to Shareholders" account. Even though several Metis payments to

_____

[5] The court takes no position on whether the Wellmans underreported their income on their tax returns at any time.

-16-

Wellman in 2010 are listed in the loan register, none of these was declared as income in the 2010 tax return.

Mr. Setzen testified that expense payments in lieu of compensation should be characterized as income, and should be reported as such. Defendants' expert Michael Teutschel ("Teutschel") agreed.

Richard believed he was entitled to compensation from Metis of up to $5,000 per month in cash or personal expenses charged to Metis as guaranteed payments either as income or against expenses from November of 2003 through the end of 2009 in the total amount of $370,000, when Metis's last project was listed for sale. However, he is not suing to recover any unpaid amounts, but merely contending that he does not owe Metis on any loans.

The court agrees that payments to Richard as just described were income to him and not loans, notwithstanding the early characterization in the books. He was entitled to be compensated for work performed, as is clear from the section of the Operating Agreement quoted above. Bennett more likely than not knew about Richard's compensation, but even if she did not, it does not follow that Richard was not entitled to it.

Consistent with Richard's understanding, Bennett was under the impression that the payments to him were to be offset against his distribution of Metis's profits.

In the 77 month period from November of 2003 through March of 2010, Richard took approximately $269,346 in payments of cash or expenses that were recorded in QuickBooks. This includes payments to Lisa.

**Simply Staged and Metis Design Group**

-17-

Richard and Bennett bought furniture to stage the Orange Street property for sale, using Metis money. After escrow closed, they placed the furniture in storage.

Lisa assisted in staging the property and received compliments and later received referrals for staging. She used the dba "Simply Staged" for her staging activities. Metis furniture in storage was used regularly to stage properties.

When Lisa staged Metis properties, there was no separate accounting for money reserved or expenses incurred. When she staged other properties, she subtracted from her gross receipts the amount of Metis labor, gas, expenses or materials, and provided the check to Richard for deposit into the Metis account with the accounting.

Bennett sometimes assisted in a non-Metis Simply Staged projects and would split the net proceeds with Lisa.

Lisa also received requests to provide interior design services including remodeling, architectural renderings and construction documents. She used the dba "Metis Design Group" for those design services.

When Metis Design Group provided design services for Metis properties, Lisa was not regularly compensated for her services. For non-Metis properties, she received checks, often made out to Metis Design or Metis Development and would deposit the checks or have Richard deposit the checks into Metis' bank account, taking her share of the money received, less any expenses advanced by Metis.

In 2008, payments to Lisa were $7,000 and in 2009, $3,000. During this time period Simply Staged's or Metis Design Group's

-18-

income not related to Metis, but which ran through the Metis accounts, was approximately $32,265.

Bennett originally ascribed to Lisa wrongful disbursements from Metis clients, but was unable to identify any of the clients as Metis projects or clients.

Lisa also received a Jeep in 2007 for her work on Metis' Del Rey Court property. This was a gift from Richard using his share of Metis profits.

**The One Distribution Made By Metis**

In October of 2007, Richard advised Bennett that Metis was going to make a distribution to her of $100,000 because of the sales of the houses on Elm and Del Rey. He wrote a $100,000 check to Bennett dated October 16, 2007 and placed "dividend" in the "memo line" (Exhibit 147). Richard did not take a $100,000 distribution. This was the only distribution ever made to Bennett. There was no evidence that this amount distributed actually constituted a "profit" distribution. There was no indication Metis had "profits" at the time or that a decision had been made for a joint distribution of profits. Accordingly, the Court declines to award to Richard any amount as a participating profit distribution on account of the counterclaim seeking an accounting and determination of moneys owed to or from the estate for this item.

**The Jeep**

Richard told Bennett that he was going to buy Lisa a jeep with part of his distribution. Of $10,750 paid for the jeep, $5,000 was paid with Metis' funds as an "automobile" expense (not marked with a "P"), and $5,750 was included on Wellman's "loans to

-19-

shareholders" sheet.  The jeep payments were made August 31, 2007 and September 6, 2007, approximately one month <u>before</u> Richard called Bennett to inform her of the pending distribution and his intent to purchase the jeep.

**The Black GMC Truck**

In July 2005 Richard sold his own black GMC truck to Metis for $28,000 without Bennett's knowledge or approval.  It appeared as an asset on Metis' tax returns.  Within 16 months he leased a Denali SUV, trading in the Black GMC.

Richard returned the SUV before the expiration of the lease term after Metis had made 33 lease payments, and he received a $16,000 refund because of the GMC trade-in.  That money was not turned over to Metis, and rather went towards Richard's purchase of a personal vehicle.

While Wellman denied that the $28,000 Metis paid for the GMC truck was a personal benefit, Tuetshel admitted that the $16,000 he ultimately received for the truck was a personal benefit.

**Other Car-Related Payments**

Richard also had Metis pay the insurance on his personal vehicles (including dirt bikes), DMV registration and insurance for non-Metis vehicles, parking and toll violations, etc.

**Third Party Loans**

Metis' books and records reflected the following third-party loans: one to Mark Kafoury in the amount of $20,000 on May 5, 2008; a second to Bob Bjorner in the amount of $25,000; and a third to Green Sun in the amount of $4,983.18.

-20-

The actual Kafoury loan payment was made by cashier's check to "Bob Bjorner." The "remitter" was Richard. Bennett was not aware of or involved in this loan.

The Bjorner loan was made by cashier's check. The "remitter" was Richard. Bennett was not aware of or involved in this loan. Some portion of the Bjorner loan, was paid back to Richard personally.

Green Sun, the borrower on the third loan, was an LLC one-hundred percent owned by Richard. Bennett had no knowledge that Metis was loaning money to Green Sun, or that Metis had any involvement in Green Sun.

**Wellmans Loan of Money to Metis**

Bennett stopped contributing to Metis's operations between April of 2006 and June of 2008. Bennett was unaware that Wellmans were lending money to Metis in 2007. The Operating Agreement was silent about loans from Richard.

During this time, Metis was involved in building the projects on Del Rey Court and Elm Street and between inadequate construction funds and ongoing mortgage obligations, additional funds were needed and Bennett was unavailable.

The Wellmans initially borrowed approximately $400,000 using their home as security and lent money to Metis in 2007 to help complete these projects. Richard intended these advances as loans.

The Wellmans loaned Metis a total of $514,200 and were repaid $309,000, leaving a balance owed from Metis of $205,200. An entry error occurred in which $25,000 was recorded as having been lent

-21-

to Metis on October 28, 2008, when that did not occur.  Exh. 4,
Exh. 163-14, Exh. H at page 54/59.

**The MPC823 Project**

In 2008 Metis became involved in a project on College Avenue
in Menlo Park through a separate limited liability company,
MPC823, LLC ("MPC823") that it owned with Cortland Bohacek.
Bennett and Richard believed they were induced to enter into the
project on false premises made by Mr. Bohacek and Vineyard Bank,
the construction lender.

Richard did not agree at any time that he would fund the
operations of Metis or specifically the MPC823 project, or
contribute capital to Metis, yet both he and Bennett guaranteed
the construction loan.

To pay construction expenses Metis would pay third party
invoices directly, and then be reimbursed by Vineyard Bank from
the construction loan.

A quote for windows and doors by Heartwood Premium Windows
and Doors was $59,823.23, later reduced to $52,7727.54 with a
fifty percent (50%) down payment (Exhibits 42, 43).

In an ill-conceived plot to create problems for Mr. Bohacek,
and with help from a friend at Heartwood, Richard devised a false
paper trail for the Heartwood window transaction in order to get a
reimbursement for more than had been expended.  Bennett knew all
about this scheme.  Of course, increasing the construction loan on
a project that failed was contrary to both of their best
interests.

When Richard had Metis submit the first claim against the
construction loan for reimbursement he submitted an invoice and a

-22-

copy of a check in the amount of $29,911.61. The actual operative invoice, paid to Heartwood, was in the amount of $26,363.77. Richard informed Mr. Bohacek that Metis had paid $29,911.64.

When the $29,911.61 reimbursement came in Richard deposited $10,000 into Metis' bank account and took $19,911.61 in cash, depositing $16,000 of that into his personal account at Chase Bank. The $10,000 was characterized as a "loan" to Metis from Richard personally (see infra).

Richard thereafter submitted a second claim against the construction loan for reimbursement in the amount of $29,911.61. In support he submitted a fraudulently created invoice that provided that the first payment of $29,911.61 had been made and that an additional $29,911.61 was due. The true amount of the second payment to Heartwood was the same as the first one, $26,563.77.

When the second reimbursement came in Richard took cash in the amount of $3,549.84, the difference between the actual amount paid for the windows and the amount submitted for reimbursement. On October 28, 2008, Richard recorded a $25,000 "loan" supposedly from him. In actuality, this was the second reimbursement for the Heartwood windows. Richard admitted this was not money from him. The Wellmans' expert, Teutschel, also orally amended his report at trial to reflect that this $25,000 was not personal money in from the Wellmans.

On March 10, 2009 Richard withdrew $9,500 from the Metis account and recorded the withdrawal as "MPC823 project costs." This was deposited into his personal account. Ten days later, on March 20, 2009, he put $8,000 back into Metis – a supposed "loan"

-23-

of his personal monies.  Based upon the bank balances, the documentary evidence showed that this $8,000 was really from Metis and part of the $9,500 withdrawal from Metis, and was not personal money from Richard.

On October 2, 2008, Bennett put $40,000 into MPC823.  She thought the transaction was to be a side-by-side equal infusion of money by both.  However, unbeknownst to Bennett, only $31,000 was actually deposited into Metis and $9,000 of this was transferred to Richard's personal bank account.  That $9,000 was wrongfully taken and was not a proper $9,000 repayment.

**The Alma Fence Credit**

In connection with the purchase of the Alma Street house, the sellers agreed to pay $15,000 for a fence credit.  Richard deposited $5,000 of that credit into a Metis bank account and kept $10,000 in cash.  He did not record it in the QuickBooks records.

**The Claimed Payments To Tom Olson**

Tom Olson was a contractor who performed work at the Del Rey house.  The Metis books and records reflect a payment to Mr. Olson on April 9, 2007 in the amount of $5,000 for siding.  In actuality, this $5,000 was taken in cash by Richard and put in the Wellmans bank account.

The Metis books also show a $6,000 payment recorded as being paid to Tom Olson on April 19, 2007.  In actuality, this amount was withdrawn in cash from Metis' bank account and taken by Wellman personally, $4,000 in a cashier's check made out to him personally and the balance in cash.

-24-

**The Troon Job**

The Wellmans did a job on Troon Street in Half Moon Bay. Richard initially borrowed $4,000 from Metis for such job, and then paid that $4,000 back a few weeks later. Metis incurred approximately $11,000 of expenses in connection with the job and yet the only revenue deposited into Metis for such job was $1,062.50. Lisa personally received $3,000 from the project.

**The Verizon Payments**

Metis made payments for cellular phone bills with Verizon. Unbeknownst to Bennett, Richard added his mother and son onto the Verizon bill, and had Metis pay for them.

**Wellman Personal Expenses Booked to Metis Jobs, General Expenses, or Unrecorded Transactions.**

Richard directed that certain of his personal expenses be paid by Metis and be coded to Metis jobs as supposed project expenses.

These included: a $975 carpet installed at the Wellmans' residence but charged to Metis' Sacramento apartment building on 26th Street; $2,250 paid to American Home Remodeler for windows installed at Wellman's residence but charged to 27th Street Sacramento; $1,220 paid to Fox Security for a security system at the Wellman's cabin in Arnold but charged to the Del Rey project; a garage door genie for $35.18 but charged to an apartment without a garage; painting supplies of $228.79 and labor of $2,000 for the Wellman's residence but charged to 26th Street in Sacramento; $1,522.24 for a bathroom set and lamp for the Wellman's residence but charged to a Sacramento property; $1,110.38 paid to A-1 Rentals and San Mateo rentals charged to Elm Street; $383.23 for

-25-

garden materials charged to Elm Street; a $1,861.59 washer and dryer that was coded as "computer equipment;" a $1,200 dirt bike trailer that was coded as "tools;" and a $3,129.09 special fireplace insert installed at the Wellman's residence billed as "job materials."

Exhibit A-2 of the report of plaintiffs' expert, Richard S. Wright ("Wright"), reveals that Richard took $9,505.40 from Metis and deposited it into his personal account. The accounting for this in QuickBooks was that it was to "Financial Title Company." Wright acknowledged this $9,505 is reflected in both QuickBooks and in banking records, and had no idea what the Title Company reference means. He did not know what it was used for, or why it was deposited in the Metis account or what property it related to. Richard believed this money was a commission rebate from the real estate agent to whom he referred business, including listings other than for Metis properties.

There also was a deposit of $14,676.15 into Metis' bank account and transferred that same day to Richard's personal account and not recorded in QuickBooks. In some instances Richard would take a "less cash" portion of a Metis deposit for himself. The bank records provided to Metis only reflected the net deposit.

All of these amounts are dealt with by the experts and are within the overall category of amounts received as personal expenses. They are in addition to the direct cash withdrawals for Richard as salary.

**Monies Paid to Lisa**

Several Metis checks were to Lisa. One was annotated "4th Q 08", as if she were receiving a salary from Metis. Four totaling

-26-

$10,000 ($2,500 on June 5, 2008, $2,000 on August 1, 2008, $2,500 on October 2, 2008 and an electronic funds transfer of $3,000 on February 9, 2009), appeared on the list of "loans." Other payments are listed in Exhibit 88-11. The sum total of all these was $17,011.19. Bennett was not aware that these payments were being made.

Lisa also used Metis credit cards for personal expenses, and yet did not reimburse Metis. These sums total up to $7,515.41.

### Bennett's Knowledge of QuickBooks and Metis' Books and Expenses

Bennett reviewed all of Metis's books and records in November of 2004 as the house on Orange Avenue was being finished and positioned for sale. She reviewed all of Metis's banking records, credit card statements, and records.

Bennett had a copy of the QuickBooks application on her personal home computer throughout Metis' existence, and when she did not because of computer breakdowns, she obtained the disk and reinstalled it. Bennett also regularly reviewed with Bernstein the Metis QuickBooks filed during the time he did Metis' bookkeeping from 2005 through 2010.

She was asked by her brother in 2007 to review project that required a QuickBooks company file be loaded onto a computer with an installed QuickBooks application.

When complications arose on the MPC823 project, Bennett obtained the MPC823 QuickBooks company file in 2008. Then, when Metis retained an attorney in 2009 for purposes of positioning Metis's claims in the lawsuit against Mr. Bohacek and Vineyard

-27-

Bank, Bennett worked with Bernstein to ascertain Metis's contributions to the MPC823 project.

**Termination of the Relationship and Attempts to Resolve**

In fall of 2010, as Metis's lawsuit against Bohacek and Vineyard Bank was progressing, Metis had no other projects ongoing. Its Sacramento properties were not fully rented and additional funds were needed by Metis to fund the lawsuit against the bank, for the management company for the Sacramento properties, for taxes and other ongoing expenses.

Metis vacated the Metis office and moved the records to Bennett's garage. And by September 13, 2010, Bennett had printed the Metis QuickBooks expenses detail for the life of Metis.

At the time Bennett was communicating with Mario Fausto, an attorney mutually retained by Metis, Bennett and Richard to prosecute a cross-complaint against Mr. Bohacek and the bank. By mid-November, 2010, Richard and Bennett had communications regarding Bennett's concerns about the expenses and books of Metis.

Bennett demanded that Richard repay her for proceeds from the Jeep Lisa had obtained in 2007 and sold in 2010. The Wellmans paid Bennett $12,000 for the Jeep when she claimed it was Metis property, and wrote an additional $25,000 check to Metis. $5,000 of this amount was in repayment of a loan she had made to Richard the year earlier.

The Wellmans continued through 2011 to attempt to resolve what Bennett claimed were unauthorized expenses. More specifically, in January of 2011, Bennett and Lisa met to review

-28-

the September, 2010 Metis expense ledger.  Exh. 6.  Lisa marked a
"W" on items that likely were Richard personal expenses.

In February through May of 2011, the Wellmans asked for the
company laptop with the QuickBooks files to help come to a number
of what, if anything, Richard owed.  Bennett would not provide to
the Wellmans an electronic copy of the QuickBooks files or the
company laptop.

By February of 2011, the relationship between Bennett and
Richard had broken down entirely, with Bennett telling their
jointly-retained attorney that Richard was a pathological liar
while at the same time, the Wellmans were paying Metis bills.

Bennett retained an attorney in July of 2011 to represent her
and Metis against the Wellmans but would not provide the Wellmans
with information from which the Wellmans could do their own
examination of the Metis records.

Richard finally obtained a copy of the Metis QuickBooks
company file in discovery in this case.

**Accounting and Damages Claims**

In March of 2014, Bennett provided her damage analysis to the
Wellmans, who retained Teutschel, a CPA, to help them provide an
accounting.

Among the damages are four pages containing approximately 200
alleged improper payments to and expenses taken by Richard in 2003
and 2004 that Bennett had either previously authorized herself
when she was reconciling the Metis Books, or predated her
reconciliation of Metis accounts when the Orange Street project
was nearing completion in November of 2004.

-29-

The Wellmans attempted to allocate expenses they believed were properly charged to them as personal expenses, as these are the only damage numbers plaintiffs supplied until expert reports were exchanged.

The Wellmans and their expert produced a reorganized list in defendants' expert report that allocated to defendants what they believed were charges properly allocable to them. It includes many of the personal expenses discussed, supra. Examples include Metis rentals for equipment that was also used at the Wellmans' house (A-1 Rentals and San Mateo Rentals), a washer/dryer purchased at Best Buy, an allocation to the Wellmans for DMV, gasoline, car maintenance and other charges for vehicles that were used both for Metis and by the Wellmans personally, carpet installation at the Wellmans' cabin and entertainment. Also included are the fireplace insert in which a fireplace was inserted into the Wellmans' home and the Wellman's wood-burning stove was then installed in Bennett's home, all using Metis money. The Wellmans reviewed the plaintiffs' damages claims and charted expenses allocable to them.

Defendants' tallied expenses properly chargeable to them. At trial, they acknowledged that the $16,000 trade-in rebate of the black GMC truck should increase those chargeable expenses. The Teutschel report acknowledges charges the Wellmans are responsible for.

The Wellmans are entitled to an offset for money lent by them and not repaid by Metis. This amount must be decreased by the erroneous QuickBooks entry for a third Heartwood Windows deposit

-30-

that did not occur.  This is also dealt with in the Teutschel report.

Many remaining items in Tabs A-D in the Plaintiffs' expert report (Exh. 163-14) consist of assumptions made by Bennett and Wright that unless the source and destination are accounted for, they are presumed to be improper expenditures made for Richard's personal benefit, done intentionally and disguised intentionally. Some are items for which Defendants have agreed.  For this they have provided an explanation that the court accepts.

The damages suffered were categorized by Wright with input from Bennett, and a written report was submitted.  The damages totaling $830,389 in the expert report were grouped in seven (7) different categories.  This damage total was amended pursuant to proof at trial by Bennett testifying that an erroneous $5,000 "credit" was applied to this, and that more sums were added in the amount of $17,018 based upon admissions in the defendants' expert report that such amounts were in fact personal.  The total sum proven at trial was $852,407 (including the payment credits).

Having considered the myriad facts and documents, including spread sheets, experts' analyses, etc., the court must reconcile all of them and find, by a preponderance of the evidence, what is owed to whom.

To begin with it is undisputed that Bennett lost at least $2,200,000 in the Metis venture, and perhaps more.  While that is unfortunate for her, it is not relevant to the issues before the court.

Next, Wellmans' expert, Teutshel, assumed correctly that the Wellmans were entitled to credit for unpaid loans.  As noted,

-31-

Richard is not seeking recovery of unpaid compensation and is thus whether or not he was entitled to assert a claim for unpaid amounts is irrelevant. Going further, Teutshel opines that if the amounts showed on the Metis books as loans to Richard were in fact loans, he owed somewhere in the neighborhood of $134,000. The court rejects the loan characterization and simply strives to determine whether the various improper advances and charges exceed the net loans he claims from Metis.

As previously noted, there is nothing in the Operating Agreement that prevented Richard from making loans to Metis; whether Bennett was aware of those loans is irrelevant as she questions whether they were impermissible. They were not.

Both experts analyzed all of the debits and credits, back and forth, and interactions among Metis, Richard, third parties, Simply Staged, Metis Design, etc., and did their best to reach a conclusion. The court starts with their conclusions and resolves them in the following manner.

First, Wright opines that the "net amount taken by Lisa and Richard Wellman" is $830,389. The court believes a proper credit against that amount is what Teutshel described as "received as guaranteed payments," namely $269,346. That leaves a net of $561,043.

From that balance the court is satisfied that Richard has made a proper showing of amounts properly paid to him as reimbursement of personal expenses in the sum of $119,811. This reduces the total to $441,232.

Case: 13-03237   Doc# 34   Filed: 02/09/15   Entered: 02/09/15 16:41:18   Page 32 of 33

Next, the cash that Metis used to repay partially the Wellman loans totaled $309,000,[6] reducing the net to $132,232.

Next is a reduction of $5,015 for what was clearly paid to Richard as salary. That reduces the net to $127,217. If that were all to it, Richard would owe that amount to Metis. But Metis did borrow from the Wellmans and Teutshel's figure of $205,200 owing is accurate, reduced only by the sum of $25,000 as shown above. That leaves a net loan of $180,000 owed by Metis. When that amount is offset against the $127,217, the "bottom line" is that Richard has a claim against Metis in the net amount of $52,783.

III. CONCLUSION

After offsets, the Wellmans are owed the sum of $52,783 from Metis Development LLC. This is an asset of the bankruptcy estate under § 541. No debt is owed to or from Bennett. Because of this conclusion the court does not need to address the statute of limitations defenses raised by the Wellmans.

The court is concurrently entering a judgment consistent with the foregoing.

* * * END OF MEMORANDUM DECISION * * *

---

[6] Wright used a figure of $209,000 but that is not supported by the evidence.

-33-